## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:

      **MICHELLE D. HILLEBRANDT,**              **CASE NO. 10-01437-NPO**

      **DEBTOR.**                                **CHAPTER 7**

**SCOTT SOISSON**                               **PLAINTIFF**

**VS.**                         **ADV. PROC. NO. 10-00068-NPO**

**MICHELLE D. HILLEBRANDT**                    **DEFENDANT**

### MEMORANDUM OPINION ON (1) AMENDED COMPLAINT OBJECTING TO DISCHARGEABILITY OF DEBT (11 U.S.C. § 523(a)(4) AND/OR (a)(6)); (2) DEBTOR'S MOTION TO STRIKE COMPLAINT OBJECTING TO DISCHARGEABILITY OF DEBT; (3) DEBTOR'S MOTION TO EXCLUDE FOREIGN TRANSCRIPT; (4) DEBTOR'S MOTION TO EXCLUDE DOCUMENTS PROVIDED APRIL 26, 2011; (5) DEBTOR'S MOTION UNDER U.S. BANKRUPTCY RULE 7037(c)(1) TO EXCLUDE ALL LATE FILED DISCOVERY FR CIV P. 26; RULE 7026; (6) DEBTOR'S MOTION TO EXCLUDE ALL TESTIMONY OF CHRIS MCCALL; AND (7) DEBTOR'S MOTION TO AMEND ANSWER

This matter came before the Court for trial on May 10, 2011, (the "Adversary Trial") on the Amended Complaint Objecting to Dischargeability of Debt (11 U.S.C. § 523(a)(4) and/or (a)(6)) (the "Amended Complaint") (Adv. Dkt. No. 3) filed by Scott Soisson ("Soisson") and the Debtor's Answer to Complaint Objecting to Dischargeability of Debt (the "Answer") (Adv. Dkt. No. 12) filed by Michelle D. Hillebrandt ("M. Hillebrandt") in the above-referenced adversary proceeding (the "Adversary"). At the Adversary Trial, Kenneth S. Womack represented Soisson, and L. Jackson Lazarus represented M. Hillebrandt.

Also before the Court were Debtor's Motion to Strike Complaint Objecting to Dischargeability of Debt (the "Motion to Strike") (Adv. Dkt. No. 14) filed by M. Hillebrandt and the Response in Opposition to Debtor's Motion to Strike Complaint (Adv. Dkt. No. 19) filed by Soisson. The Court also considered a number of evidentiary motions filed by M. Hillebrandt, including: (1) Debtor's Motion to Exclude Foreign Transcript (Adv. Dkt. No. 36); (2) Debtor's Motion to Exclude Documents Provided April 26, 2011 (Adv. Dkt. No. 37); and (3) Debtor's Motion under U.S. Bankruptcy Rule 7037(c)(1) to Exclude All Late Filed Discovery FR Civ P 26; Rule 7026 (Adv. Dkt. No. 47) (collectively, the "Motions to Exclude"). In response to the Motions to Exclude, Soisson filed Plaintiff's Response in Opposition to Debtor's Motion to Exclude Foreign Transcript (the "Response to Motion to Exclude Transcript") (Adv. Dkt. No. 38) and Plaintiff's Response in Opposition to Debtor's Motions to Exclude (the "Global Response to Motions to Exclude") (Adv. Dkt. No. 49). Also before the Court was Debtor's Motion to Exclude All Testimony of Chris McCall (Adv. Dkt. No. 44) filed by M. Hillebrandt.

After the Adversary Trial, M. Hillebrandt filed Debtor's Motion to Amend Answer (the "Motion to Amend Answer") (Adv. Dkt. No. 52) and the Debtor's Amended Answer to Complaint Objecting to Dischargeability of Debt (the "Amended Answer") (Adv. Dkt. No. 53). Soisson filed Plaintiff's Response in Opposition to Defendant's Motion for Leave to Amend Answer or, in the Alternative, Cross-Motion to Reopen Discovery Regarding Issues Raised by Amended Answer (the "Response to Motion to Amend Answer") (Adv. Dkt. No. 54). The Court will address the Motion to Amend Answer and the Response to Motion to Amend Answer in this opinion.

The Court, having heard the testimony of Soisson, M. Hillebrandt, and Ernest P. Hillebrandt ("E. Hillebrandt") at the Adversary Trial, and having considered the transcript and the exhibits from

the state court lawsuit, and other exhibits that were admitted into evidence at the Adversary Trial, finds that the debt reflected in the state court judgment entered against M. Hillebrandt and in favor of Soisson in the principal amount of $383,621.75[1] is not excepted from discharge under either 11 U.S.C. § 523(a)(4) or 11 U.S.C. § 523(a)(6) for the reasons set forth below.[2]

## Jurisdiction

This Court has jurisdiction over the parties and the subject matter of this Adversary pursuant to 28 U.S.C. § 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). Notice of the Adversary Trial was proper under the circumstances (Adv. Dkt. Nos. 34 & 42).

## Facts

What follows below is an outline of not only those facts that resulted in the entry of a state court judgment against M. Hillebrandt but also other facts regarding the same matter that were presented at the Adversary Trial. The dischargeability *vel non* of the debt reflected in the state court judgment is the subject of this Adversary.

A.      **The Texas Lawsuit**

On July 31, 2006, Soisson filed a lawsuit against M. Hillebrandt and her then husband E. Hillebrandt[3] (together, the "Hillebrandts") in Cause No. 27,535 (the "Texas Lawsuit") in the

---

[1] The Pre-trial Order prepared by counsel incorrectly states that this amount is $382,261.00. See Adv. Dkt. No. 50.

[2] Pursuant to Federal Rule of Civil Procedure 52, as made applicable to this Adversary by Federal Rule of Bankruptcy Procedure 7052, the following constitutes the findings of fact and conclusions of law of the Court.

[3] E. Hillebrandt and M. Hillebrandt divorced sometime after the events relevant to this dispute had taken place.

District Court of Jasper County, Texas (the "Texas Court").[4]   Soisson alleged in Plaintiff's Original

Petition (the "Texas Petition") that he and the Hillebrandts jointly owned Check Masters, Inc.

("Check Masters"), a payday loan business, and that he was entitled to 50% of the profits of the

business.[5]   Although he received some profits from the business, Soisson claimed that the

Hillebrandts secreted profits from him and converted them to their own personal use and benefit. [6]

 They also secured debt in his name without his knowledge or consent.[7]   Soisson further maintained

that in May, 2006, the Hillebrandts closed Check Masters and absconded with the remaining profits

and assets of the business.[8]

Soisson claimed in the Texas Petition that the Hillebrandts engaged in the following wrongful

conduct: (1) they "perpetrate[d] an actual fraud . . . by knowingly providing false financial

information to the Plaintiff [Soisson]"; (2) they "secret[ed] and embezzl[ed] monies of the purported

corporation to their own personal use and benefit"; (3) they "divest[ed] Check Master, Inc. [sic] of

its assets to the detriment and exclusion of this Plaintiff [Soisson]"; (4) they "breached their fiduciary

duty to Scott Soisson and Check Master, Inc. [sic] by converting and secreting corporate revenues for

cash and payment of personal debts and obligations of said Defendants [the Hillebrandts]"; (5) they

"have actively engaged in fraud and misrepresentation regarding the purported corporate nature of

said business entity"; and (6) they breached an oral contract with Soisson "on or about May of 2006

---

[4] Tex. Pet., Ex. 1 to Am. Compl. (Adv. Dkt. No. 3).

[5] Id. ¶ IV.

[6] Id. ¶¶ IV & VI.

[7] Id. ¶ VI.

[8] Id. ¶¶ IV & VIII.

when Defendants [the Hillebrandts] unilaterally and arbitrarily ceased operations of Check Master, Inc., [sic] and have failed to pay and/or account to this Plaintiff [Soisson] for the corporate revenues . . . and his 50% of the profits."[9]

After the Hillebrandts became aware of the Texas Lawsuit,  E. Hillebrandt hired an attorney to represent them.  Their attorney filed an answer on their behalf but, according to the Hillebrandts, did little else to defend them.  The Hillebrandts claim that the trial in Texas took place on October 31, 2007, without their knowledge and in the absence of the attorney that E. Hillebrandt had retained to represent them (the "Texas Trial").

## B.    The Texas Trial

To establish his claims of liability against the Hillebrandts at the Texas Trial, Soisson relied on his own testimony and the testimony of two former employees of Check Masters:[10] Christopher McCall ("McCall") and Erica Simmons ("Simmons").

### 1.    Testimony of McCall

McCall testified that he worked as the general manager for Check Masters in Texas for six years from 1999 until 2006, when Check Masters ceased doing business there.[11]  McCall explained that Check Masters was in the business of making payday advance loans, which he described as small loans ranging in amount from $25.00 to $300.00, with maturity dates of no more than two weeks that usually encompassed the customer's next payday.  Check Masters charged a fee for this check-cashing

---

[9]  Id. ¶¶ V, VI, VII & VIII.

[10]  Soisson's attorney, Todd Kassaw, also testified to support Soisson's claim for attorney's fees.

[11]  Tex. Trial Tr. at 5, Adv. Trial Ex. P-1.

service, the amount of which was based on the amount the customer borrowed.  For example, a customer who received $300.00 in cash, repaid Check Masters $365.88, the difference of $65.88 being Check Masters's service fee.  Because of the nature of the business, Check Masters generated hundreds of thousands of dollars.

In June 2002, E. Hillebrandt informed McCall that M. Hillebrandt had taken corporate funds from Check Masters and told McCall to notify him if McCall suspected her of stealing money in the future.[12]  Much later, in June 2004, McCall began receiving telephone calls from vendors complaining about overdue bills and soon discovered why they were not being paid:  money was missing from Check Masters's bank account.[13]  Although McCall informed E. Hillebrandt, "[n]othing was done about it."[14]  Then, in June 2005, Soisson, who McCall identified as an "investor" in the company, asked McCall to investigate why a business check made payable to a day-care center had been returned for insufficient funds.[15]  McCall reported to Soisson that the Hillebrandts were using corporate funds to pay their personal debts, including payments on their car loan and credit card charges.[16]

### 2.    Testimony of Simmons

Simmons testified that she worked in Check Masters's office in North Lufkin, Texas, from 2003 until 2006.  At M. Hillebrandt's request, Simmons wrote several business checks made payable

---

[12] Id. at 6.

[13] Id. at 6.

[14] Id. at 7.

[15] Id.

[16] Id.

to "Cash."[17]   M. Hillebrandt herself also wrote checks drawn on Check Masters's bank account, including checks for payment of the Hillebrandts's American Express account.[18] Simmons was aware of these checks because her job required her to reconcile Check Masters's bank statement at the end of each month.[19]

### 3.      Testimony of Soisson

Soisson testified that he and E. Hillebrandt each invested $20,000.00 in return for 50% ownership of Check Masters.[20]   Although Soisson had received several cash disbursements from Check Masters, the Hillebrandts had spent $322,353.00, for which he had not received equal cash disbursements.[21]   Soisson arrived at $322,353.00 based on his review of certain bank records of Check Masters and the Hillebrandts.  For example, there were several checks made payable to E. Hillebrandt's sister, who had worked for the Hillebrandts as their babysitter.[22]   He included the amounts of these checks in his calculation.  Similarly, in March 2006, two checks made payable to M. Hillebrandt in the total amount of $11,100.00 were deposited days later into the personal bank account of the Hillebrandts by M. Hillebrandt.[23]   He also included the amount of these checks in his calculation.

---

[17] Id. at 10-11.

[18] Id. at 13.

[19] Id. at 12-13.

[20] Id. at 15.

[21] Id. at 15-16.

[22] Id. at 16.

[23] Id. at 17-18.

In a separate matter involving the alleged forgery of his name, Soisson testified that M. Hillebrandt had obtained a $15,000.00 company loan from Capital One using Soisson's name, social security number, and financial information without his knowledge or consent.[24]  The loan was later repaid by Check Masters.[25]

Near the end of the Texas Trial, Soisson offered four exhibits into evidence in further support of his claims.  The first two exhibits consist of the bank statements of Check Masters, Inc. of North Lufkin from November 2004 through November 2005.  See Adv. Trial Ex. P-1, Ex. 1-2.  The third exhibit consists of copies of checks drawn on the accounts of either Check Masters, Inc. of North Lufkin or Check Masters, Inc. of South Lufkin from April 2003 through February, 2006. See Adv. Trial Ex. P-1, Ex. 3.   The fourth exhibit consists of documents related to a $15,000 business loan obtained by Check Masters in Soisson's name.  See Adv. Trial Ex. P-1, Ex. 4.  These exhibits will be referred to collectively as the "Texas Trial Exhibits."

## C.       The Texas Judgment

Immediately following the Texas Trial, the Texas Court entered a default judgment against the Hillebrandts (the "Texas Judgment") in which it made the following findings: (1) "that the Plaintiff was a shareholder in the company and . . . was entitled to distribution of 50% of the profits"; (2) "that the Plaintiffs [sic] knowingly committed fraud and misrepresentation, and such conduct caused actual damages to the Plaintiff"; and (3) "that the Defendants knowingly and intentionally converted and/or embezzled money from the company in the amount of at least $322,353.00."  See Tex. J., Adv. Trial Ex. P-2.  The Court awarded Soisson actual damages, attorney's fees, and court

---

[24] Id. at 19; see Adv. Trial Ex. P-1, Ex. 4.

[25] Id.

costs against the Hillebrandts, jointly and severally, in the amount of $183,621.75; exemplary damages against E. Hillebrandt, severally, in the amount of $200,000.00; exemplary damages against M. Hillebrandt, severally, in the amount of $200,000.00; and post-judgment interest at the legal rate. See id. No appeal was taken from the Texas Judgment.

On August 18, 2008, Soisson enrolled the Texas Judgment in Adams County, Mississippi, Case No. 08-KV-0017 ("Enrollment of Texas Judgment"), pursuant to the Uniform Enforcement of Foreign Judgments Act, Miss. Code Ann. § 11-7-301 through § 11-7-309 (Rev. 2004). See Adv. Trial Ex. P-3. An Amended-Notice of Filing of Foreign Judgment was mailed to the Hillebrandts, but they did not file a response contesting the enrollment. See Adv. Trial Ex. P-3; Miss. Code Ann. § 11-7-305(3) (Rev. 2004) (providing that no execution or other process for enforcement may issue for twenty days after the filing of a foreign judgment).

**D.      Bankruptcy Proceedings**

M. Hillebrandt filed a petition for relief under chapter 7 of the Bankruptcy Code on April 20, 2010 (Case No. 10-01437, Dkt. No. 1). In the bankruptcy schedules, she listed Soisson as having an unsecured claim in the amount of $583,000.00. (Case No. 10-01437, Dkt. No. 3). On May 21, 2010, the chapter 7 trustee filed a report indicating that there was no property or money to be distributed and that the bankruptcy estate of M. Hillebrandt had been fully administered.

On July 20, 2010, Soisson initiated this Adversary against M. Hillebrandt to obtain a determination[26] that the Texas Judgment was a non-dischargeable debt (a) under 11 U.S.C. § 523(a)(4) because it established fraud or defalcation while acting in a fiduciary capacity,

---

[26] E. Hillebrandt also filed a chapter 7 petition for relief, but Soisson did not file an adversary proceeding in his case. See In re Ernest P. Hillebrandt, Case No. 09-03575-NPO, Dkt. No. 1.

embezzlement, or larceny and/or (b) under 11 U.S.C. § 523(a)(6)[27] because it established a "willful

and malicious injury." The Amended Complaint incorporates by reference the Texas Petition, the

Final Judgment, and the Amended-Notice of Filing of Foreign Judgment. M. Hillebrandt received

her chapter 7 discharge on August 5, 2010 (Case No. 10-01437, Dkt. No. 23).

### 1.    Pre-trial Motions

### a.    Motion to Strike

Before the Adversary Trial, the Court ruled upon the Motion to Strike and the Response in

Opposition to Debtor's Motion to Strike Complaint. The Motion to Strike filed by M. Hillebrandt

is not a model of clarity.[28] Despite its caption, the Motion to Strike seeks dismissal of the Amended

Complaint for failure "to state a cause of action under which this debt can be declared non-

dischargeable." Thus, the Court treated the Motion to Strike as a request for dismissal under Rule

12(b)(6) of the Federal Rules of Civil Procedure, as made applicable to adversary proceedings by Rule

7012 of the Federal Rules of Bankruptcy Procedure.

The Court ruled from the bench that the Amended Complaint contained sufficient factual

allegations, which the Court accepted as true, that plausibly suggested Soisson was entitled to the

relief he requested under both § 523(a)(4) and § 523(a)(6). In its ruling, the Court was guided by

Ashcroft v. Iqbal, 129 S. Ct. 1937, 1951 (2009), and Bell Atlantic Corp. v. Twombly, 550 U.S. 544

(2007), in which the United States Supreme Court clarified the pleading standards set forth in Rule

---

[27] Hereinafter, all code sections refer to the United States Bankruptcy Code found at Title 11 of the United States Code unless otherwise noted.

[28] A motion to strike is designed to attack redundant, immaterial, impertinent, or scandalous matters. See Fed. R. Civ. P. 12(f); Fed. R. Bankr. P. 7012(f).

8(a)(2) of the Federal Rules of Civil Procedure.  In short, a complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests[.]" <u>Twombly</u>, 550 U.S. at 555. This Court found that the Amended Complaint, which references and incorporates the Texas Petition and the Texas Judgment, easily satisfied that pleading standard.

The Court noted from the bench that for the most part the Motion to Strike raises factual disputes about whether there was a fiduciary relationship between M. Hillebrandt and Soisson that was sufficient to satisfy the provisions of § 523(a)(4) and about whether M. Hillebrandt intended to cause Soisson harm within the meaning of § 523(a)(6). The Court found that the resolution of these factual disputes was not the proper subject of a motion under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Rather, it is sufficient if the factual allegations "raise a right to relief above the speculative level." <u>Twombly</u>, 550 U.S. at 555.   Indeed, if  Soisson could not prove the presence of a genuine issue of material fact concerning an essential element of his case, then the appropriate motion for M. Hillebrandt to file was a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure, as made applicable by Rule 7056 of the Federal Rules of Bankruptcy Procedure, which she did not.

### b.    Motions to Exclude

Also at the Adversary Trial, the Court ruled upon the evidentiary motions filed by M. Hillebrandt.  The Motions to Exclude concern the transcript of the Texas Trial (the "Transcript") and the previously mentioned Texas Trial Exhibits.  M. Hillebrandt sought to exclude these documents from evidence at the Adversary Trial on the ground that Soisson did not disclose them in his responses to her requests for production of documents and did not supplement his responses in a timely manner as required by Rule 7026(e) of the Federal Rules of Bankruptcy Procedure.  Instead,

Soisson sent the Transcript via email to counsel for M. Hillebrandt on April 20, 2011, which was twenty days before the Adversary Trial and several months after passage of the discovery deadline. See Agreed Amended Scheduling Order (Adv. Dkt. No. 21). Soisson did not provide M. Hillebrandt with a hard copy of the Transcript or a copy of any of the Texas Trial Exhibits until April 26, 2011. M. Hillebrandt asked this Court to exclude the Transcript and Texas Trial Exhibits as late-produced discovery under the provisions of Rule 7037(c)(1) of the Federal Rules of Bankruptcy Procedure, which states in pertinent part:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

Fed. R. Bankr. P. 7037(c)(1).

Without question, Soisson's disclosure of the Transcript and Texas Trial Exhibits was untimely. Thus, the only issue before the Court was whether Soisson could prove that his untimely disclosure in violation of Rule 7026(e) of the Federal Rules of Bankruptcy Procedure was either substantially justified or harmless. The Court's decision was guided by consideration of the following four factors: "(1) the importance of the evidence; (2) the prejudice to the opposing party of including the evidence; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation for the party's failure to disclose." Tex. A&M Research Found. v. Magna Transp., Inc., 338 F.3d 394, 402 (5th Cir. 2003).

In support of his argument that the untimely disclosure was substantially justified, Soisson explained that his search for the Transcript began in earnest on June 28, 2010, but that his efforts were derailed because of information he received from the clerk's office of the Texas Court and that date

and again, as recently as March 31, 2011, that no audio recording of the Texas Trial existed or could be found.[29]  That information was provided by the court reporter permanently assigned to the judge who had presided over the Texas Trial.  Upon further inquiry, Soisson learned that a substitute court reporter had covered the Texas Trial because the permanent court reporter was absent that day.  On April 14, 2011, Soisson contacted the substitute court reporter, who was able to locate the audio recording.  She also informed him about the existence of the Texas Trial Exhibits.  Soisson immediately arranged for her to transcribe the recording.  On April 19, 2011, Soisson  received the transcript via email shortly after 5:00 p.m. and forwarded it to counsel for M. Hillebrandt on that same day.  Soisson forwarded a hard copy of the Transcript and the Texas Trial Exhibits to M. Hillebrandt on April 26, 2011.  In support of these facts, Soisson provided affidavits from his counsel and his counsel's legal assistant.  See Adv. Dkt. No. 38-1.   These affidavits included emails to and from the substitute court reporter.  See Adv. Dkt. No. 38-1.

The Court concluded that given the incorrect information Soisson initially received from the clerk's office for the Texas Court and the efforts Soisson made to obtain the documents, Soisson's delay in producing the Transcript and the Texas Trial Exhibits to M. Hillebrandt was substantially justified.  Although this finding alone required the Court to deny the Motions to Exclude under Rule 7026(e) of the Federal Rules of Bankruptcy Procedure, the Court recognized that the admission of the Transcript and Texas Trial Exhibits was not harmless to M. Hillebrandt, given the short period of time she had to review the numerous bank statements and cancelled checks and prepare for their use at the Adversary Trial. Accordingly, the Court denied the Motions to Exclude but granted M.

---

[29] Affs. of K. Womack & C. Jones, Ex. A to Resp. to Mot. to Exclude Tr. (Adv. Dkt. No. 38-1).

Hillebrandt the option of continuing the Adversary Trial as a remedy for Soisson's late-produced discovery.  M. Hillebrandt declined the Court's offer to continue the Adversary Trial.

### c.      Motion to Exclude Testimony

Finally, the Court denied as moot Debtor's Motion to Exclude all Testimony of Chris McCall.  In the Global Response to Motions to Exclude, Soisson withdrew from the Pre-trial Order Chris McCall's name from the list of witnesses who would be called to testify in person at the Adversary Trial.

### 2.      The Adversary Trial

A  Pre-trial Order was entered at the start of the Adversary Trial on May 10, 2011.  (Adv. Dkt. No. 50).

### a.      Soisson's Case-in-chief

The Court first heard testimony from Soisson, who in further support of his dischargeability claims introduced into evidence the Transcript of the Texas Trial, including the Texas Trial Exhibits, the Texas Judgment, and the Amended-Notice of Filing of Foreign Judgment.  See Adv. Trial Exs. P-1, P-2, & P-3.

Soisson testified that he owned a fishing tackle shop in Brookeland, Texas, where he and the Hillebrandts lived, and it was there in the tackle shop that he first met E. Hillebrandt.  Soisson and E. Hillebrandt soon became friends.  Sometime later, E. Hillebrandt asked Soisson, who knew that E. Hillebrandt owned a payday loan business in Mississippi, if he wanted to join him in starting a similar business in Lufkin, Texas.  Soisson agreed to invest $20,000.00 with the understanding that E. Hillebrandt would invest the same amount and that they would share equally in the profits.  This

agreement was entered into without the formality of any written documents and specifically without the issuance of stock certificates evidencing the ownership of the new company.[30]

The new company began doing business in Texas in late 1999 or early 2000 under the name "Checks 2 Cash," but for reasons that Soisson could not explain, the name of the company was changed to Check Masters.[31] Soisson had check-writing authority on Check Masters's bank account, as did the Hillebrandts and several employees, including McCall and possibly Simmons. Other than writing a few checks, however, Soisson was not an active participant in the business.[32] Soisson explained his role in the business, as follows:

> A:      [L]ike I said, I took Ernie [E. Hillebrandt] for his word. We became great friends. He said we going to have nothing to do. We'd get a check every month. If any money left over, we would get that too. That's just what he told me.
>
> *  *  *
>
> A:      I had another business I was running and it was just like an investment in the stock market or something else to me. I just, you know, I put money in and that's what he told me. That's the way it was going to be run.[33]

Soisson became more involved in the business after E. Hillebrandt told him that M. Hillebrandt had been taken company funds.[34] On that occasion, E. Hillebrandt gave him $7,000.00 or $8,000.00 in cash, ostensibly to compensate him for the funds taken by M. Hillebrandt.[35] Soisson

---

[30] Test. of Soisson at 11:19:48 to 11:20:44. The Adversary Trial was not transcribed. References to testimony are cited by the timestamp of the audio recording.

[31] Id. at 11:12:50 to 11:13:00, 11:19:10 to 11:19:27.

[32] Id. at 11:13:45 to 11:14:06, 11:22:00 to 11:25:05.

[33] Id. at 11:14:44 to 11:15:25.

[34] Id. at 11:15:30 to 11:16:20.

[35] Id.

then obtained copies of bank statements and was surprised to find electronic withdrawals from the bank accounts of Check Masters for the payment of the Hillebrandts' mortgage, car loan, satellite television service, and credit card charges.[36]   He stated that there was no legitimate reason why M. Hillebrandt should have received money from Check Masters, other than for payment of her wages. Soisson conceded that M. Hillebrandt was "about the worst embezzler" but maintained that he did not have access to the company's bank statements.[37]   Soisson then ended his case-in-chief.

Claiming that Soisson had failed to produce sufficient evidence of a fiduciary relationship between them and, moreover, that there had been an accord and satisfaction of Soisson's claims, M. Hillebrandt moved for "summary judgment" at the close of Soisson's case-in-chief.   The Court treated the "summary judgment" motion as a motion for judgment on partial findings pursuant to Rule 52(c) of the Federal Rules of Civil Procedure,[38] as made applicable to adversary proceedings by Rule 7052 of the Federal Rules of Bankruptcy Procedure.   The Court ruled from the bench, granting a judgment as a matter of law in favor of M. Hillebrandt as to the § 523(a)(6) claim but denying her a judgment as to the § 523(a)(4) claim.   The Court found that Soisson had failed to meet his burden of proving a "willful and malicious" injury, a required element of a *prima facie* case of non-dischargeability under § 523(a)(6).   The Court also found that M. Hillebrandt had waived the affirmative defense of

---

[36] For example, Check Masters's bank statement for the month of February, 2005, shows two payments to "Mortgage Svc Ctr" in the amount of $884.13, to "Directv" in the amount of $96.00, to "Ford Credit" in the amount of $610.00, and to "American Express" in the amount of $400.00. See  Adv. Trial Ex. P-1, Ex. 1 at Bates Nos. 1349 & 1350.

[37] Id. at 11:22:40 to 11:23:57.

[38] The Court may enter a judgment "if a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue . . . ." Fed. R. Civ. P. 52.

accord and satisfaction. The Court briefly discussed the basis for its findings on the record from the bench and will reiterate and supplement that discussion here.

Section 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." The Supreme Court in <u>Kawaauhau v. Geiger</u>, 523 U.S. 57 (1998), held that in order to fall within the exception of § 523(a)(6), an injury must be deliberate or intentional, rather than merely an injury that is the result of a deliberate or intentional act. <u>Id.</u> at 61; <u>see also</u> <u>Chrysler Credit Corp. v. Perry Chrysler Plymouth, Inc.</u>, 783 F.2d 480, 486 (5th Cir. 1986). Following <u>Kawaauhau</u>, the United States Court of Appeals for the Fifth Circuit in <u>Miller v. J.D. Abrams Inc. v. Miller (In re Miller)</u>, 156 F.3d 598 (5th Cir. 1998), collapsed the terms "willful and malicious" into a single, unitary concept. In non-dischargeability proceedings involving debts arising from tortious conduct, an injury is both "willful and malicious" where there is either (1) an objective substantial certainty of harm or (2) a subjective motive to cause harm. <u>Miller</u>, 156 F.3d at 606. More recently, the Fifth Circuit in <u>Williams v. Int'l Bhd. of Elec. Workers (In re Williams)</u>, 337 F.3d 504, 509 (5th Cir. 2003), reaffirmed that "a debtor must commit an intentional or substantially certain injury in order to be deprived of a discharge." <u>Id.</u>; <u>see also</u> <u>Raspanti v. Keaty (In re Keaty)</u>, 397 F.3d 264, 273-74 (5th Cir. 2005).

Soisson's testimony, the Texas Judgment, the Texas Transcript, and the Texas Trial Exhibits,[39] did not establish either that M. Hillebrandt's actions demonstrated an objective substantial certainty to cause harm or that M. Hillebrandt intended to cause harm. <u>See</u> <u>McSwain v. Stennis (In re Stennis)</u>, Adv. Proc. No. 09-05054-NPO, 2010 WL 2025511 (Bankr. S.D. Miss. May 19, 2010);

---

[39] At this stage of the Adversary Trial, the Court assumed, without deciding, that the Texas Judgment had preclusive effect for the purpose of deciding the "summary judgment" motion before it.

Herring v. Parish (In re Parish), Adv. Proc. No. 09-05025-NPO, 2009 WL 4782128 (Bankr. S.D. Miss. Dec. 7, 2009). In the absence of evidence that M. Hillebrandt's actions were motivated by a desire to harm Soisson, the Court looked to whether the evidence presented by Soisson satisfied the objective standard.

The Texas Judgment states that M. Hillebrandt's "knowingly committed fraud" and "knowingly and intentionally converted and/or embezzled money." Although these are intentional torts, the Fifth Circuit has cautioned that in analyzing § 523(a)(6) "[m]erely because a tort is classified as intentional does not mean that any injury caused by the tortfeasor is willful." Miller, 156 F.3d at 604. The Fifth Circuit has also held that the assessment of punitive damages under state law is not dispositive of the issue because the meaning of "willful and malicious" is controlled by federal law. Miller, 156 F.3d at 604. With these precepts in mind, the Court found that even if M. Hillebrandt had acted intentionally when she wrote checks to herself or asked others to do so, a fact that M. Hillebrandt herself confirmed in her latter testimony, the evidence presented in Soisson's case-in-chief did not show that her actions were substantially certain to cause him financial harm. See, e.g., Bordelon v. Boring (In re Boring), 445 B.R. 576 (Bankr. M.D. La. 2011) (debtor's knowing breach of contract was not willful and malicious so as to render debt non-dischargeable under § 523(a)(6)).

As to the second ground raised by M. Hillebrandt in support of her "summary judgment," the Court gave short shrift to M. Hillebrandt's defense of accord and satisfaction, which she raised for the first time at the Adversary Trial at the close of Soisson's case.[40] See Woodfield v. Bowman, 193 F.3d 354, 362 (5th Cir. 1999). Rule 8(c)(1) of the Federal Rules of Civil Procedure, as made

---

[40] After the Adversary Trial, M. Hillebrandt filed the Motion to Amend Answer and Amended Answer. The Court addresses these filings later in this opinion. See infra at 26-28.

applicable by Rule 7008 of the Federal Rules of Bankruptcy Procedure, lists accord and satisfaction among the defenses that "a party must affirmatively state" in response to a pleading. Yet, M. Hillebrandt did not plead it in her Answer or include it in the Pre-trial Order. As stated in Glass Containers Corp. v. Miller Brewing Co., 643 F.2d 308 (5th Cir. 1981), "[a] litigant cannot strategically lie behind the log until after the trial and receipt of evidence [and] argument . . . before raising an issue not found in the pleadings nor included in the pretrial order and then raise it when it is too late for his opponent to do anything about it. The manifest prejudice of such tactics would make a shambles of the efficacy of pretrial orders and a fair trial." Id. at 312. For this reason, the Court found that M. Hillebrandt had waived accord and satisfaction as a defense to Soisson's claims. See Woodfield, 193 F.3d at 362.

Even if the Court had considered the accord and satisfaction defense on the merits, M. Hillebrandt would not be entitled to a judgment on that ground. M. Hillebrandt testified in the Adversary Trial that in 2008, after the Texas Judgment had been entered, the Criminal District Attorney of Jasper County, Texas, charged her with the crime of forgery.[41] As part of a plea bargain agreement, the offense was non-adjudicated on the condition that M. Hillebrandt pay full restitution.[42] M. Hillebrandt produced a receipt dated July 29, 2008, (the "Receipt") (Adv. Trial Ex. D-1) that was typed on the letterhead of the Criminal District Attorney. Soisson's signature appears below the following paragraph:

> I, Scott Soisson, . . . received cashier's check . . . in the amount of $8,901.00 from Novie Hammock of the Criminal District Attorney's Office, on this date for payment

---

[41] Test. of M. Hillebrandt at 1:55:12 to 1:55:59, 1:57:20 to 1:57:58.

[42] Id. at 1:56:12 to 1:57:06.

of restitution by Michelle Hillebrandt.  The restitution is for forgery, [sic] Jasper
County Sheriff Department case number 0701107.  Restitution is paid in full.

See Adv. Trial Ex. D-1.  At the Adversary Trial, Soisson affirmed that he had lodged a criminal

complaint against M. Hillebrandt for forgery and had received restitution.[43]  Neither M. Hillebrandt

nor Soisson testified about the specifics of the crime charged.

Under Texas common law, to prevail on her defense of an accord and satisfaction, M.

Hillebrandt had to show, *inter alia*, that Soisson specifically and intentionally agreed to discharge M.

Hillebrandt's debt to him. In Milton M. Cooke Co. v. First Bank & Trust, 290 S.W.3d 297 (Tex. Ct.

App. 2009), the Texas Court of Appeals noted that there must be an "unmistakable communication

to the creditor that tender of the lesser sum is upon the condition that acceptance will constitute

satisfaction of the underlying obligation." Id. at 309 (citations omitted).  There is no evidence that M.

Hillebrandt tendered payment to Soisson on the condition he release her from the Texas Judgment.

Indeed, she paid the Criminal District Attorney's Office, not Soisson.  Moreover, to the extent the

Receipt may be considered a release, even though it was not drafted for that purpose, it refers only

to forgery, and does not mention embezzlement or larceny.

### b.     M. Hillebrandt's Case-in-chief

After denying M. Hillebrandt's "summary judgment," the Court then heard testimony from

the Hillebrandts, who were the only witnesses other than Soisson to testify in person at the Adversary

Trial.  In her testimony, M. Hillebrandt denied embezzling money from Check Masters and denied

---

[43] Test. of Soisson at 11:28:00 to 11:29:28.

committing any fraud.[44] She freely admitted writing checks on Check Masters's bank account for her personal benefit, but she insisted that she did so with the approval of Check Masters.[45]

The Hillebrandts formed Check Masters in Natchez, Mississippi, in April, 1995, and they ran it together in Mississippi as a family-owned business. The Corporate Annual Report filed by Check Masters with the Mississippi Secretary of State's Office in 2008 identifies E. Hillebrandt as its president and M. Hillebrandt as its secretary and treasurer. Adv. Trial Ex. D-2. The officers of Check Masters remained the same from the date of its incorporation until 2009. Soisson's name does not appear on the Corporate Annual Report.

The Hillebrandts used their finance license in Mississippi to operate Check Masters in Texas. In 2005 or 2006, Check Masters closed all four of its locations in Texas but continued its operations in Mississippi until 2010 when M. Hillebrandt filed her petition for relief under chapter 7. Soisson never owned any interest in Check Masters and never worked for Check Masters.[46] Soisson, however, was authorized to sign checks drawn on Check Masters's bank accounts in Texas. On cross-examination, M. Hillebrandt was asked to explain why this was so:

> Q.      He wasn't an employee. He didn't have any ownership interest. I'm trying to figure out what he was in relationship to Check Masters. He had check-writing privileges/authority. What was he then?
>
> A.      He was Ernie's best friend.[47]

---

[44] Test. of M. Hillebrandt at 1:49:30 to 1:50:03.

[45] Id. at 2:15:33 to 2:15:55.

[46] Id. at 2:06:54 to 2:07:27.

[47] Test. of M. Hillebrandt at 2:10:18 to 2:10:36, 1:58:40 to 1:58:57.

Regarding Soisson's investment, M. Hillebrandt testified that Soisson approached E. Hillebrandt about investing in the payday loan business in Texas, and not the other way around. Soisson and E. Hillebrandt each invested $20,000.00 in Checks 2 Cash, a separate company from Check Masters. M. Hillebrandt further stated that when Checks 2 Cash later ceased operations, Soisson was repaid the amount of his investment and more. It was at that time that Soisson's interest in the payday loan business ended, according to M. Hillebrandt.

E. Hillebrandt's testimony mirrored M. Hillebrandt's except with respect to certain details not relevant to the present dispute. E. Hillebrandt testified that he incorporated Check Masters in Mississippi in 1994.[48] Although M. Hillebrandt testified that they jointly owned Check Masters, E. Hillebrandt stated that he was its sole shareholder until the Hillebrandts divorced, which occurred sometime after Check Masters had ceased doing business in Texas.[49] Like M. Hillebrandt, E. Hillebrandt denied that Soisson was ever a shareholder of Check Masters, or that they were ever business partners.[50]

E. Hillebrandt explained that he incorporated Checks 2 Cash in Texas in 1998. Two years later, the Texas Attorney General's Office notified him that it was illegal to operate a payday loan business and that he must close Checks 2 Cash within 30 days or would risk government seizure of all of its assets. E. Hillebrandt wondered why other payday loan companies in the same area were allowed to stay. He soon discovered what he thought was a "loophole" in the law: he believed that a payday loan company formed under the laws of another state could lawfully operate in Texas by

---

[48] Test. of E. Hillebrandt at 2:17:35 to 2:17:40.

[49] Id. at 2:17:40 to 2:17:51; 2:20:54 to 2:20:57.

[50] Id.

importing the rates of that foreign jurisdiction.[51]  Without any interruption in business, he began

operating the company under the name Check Masters at the same locations in Texas previously

occupied by Checks 2 Cash.  E. Hillebrandt repaid Soisson his initial investment of $20,000.00 in

cash from the assets of Checks 2 Cash, invested the balance into Check Masters, and shut down

Checks 2 Cash.[52]  E. Hillebrandt described these events, as follows:

> A:      . . . I collected all the money in for Checks 2 Cash, shut that business down,
> and I opened up Check Masters.
>
> Q:      Okay, using whatever the proceeds were out of Checks 2 Cash?
>
> A:      After Scott and I took our initial investment back out in cash, yes, we left the
> rest of the money invested in loans.
>
> Q:      You wrote him out a check for $20,000.00?
>
> A:      No, I said "cash."  That's not a check.
>
> Q:      You gave him cash for $20,000.00?
>
> A:      And I took cash.
>
> Q:      When was this?
>
> A:      2000.
>
> Q:      Is there any record of that?
>
> A.      That's part of the reason we took cash.[53]

E. Hillebrandt admitted that he did not inform Soisson that his interest in the business had ended,

although he insisted that Soisson understood that it had, since he did not buy into Check Masters.

--------

[51] Id. at 2:19:54 to 2:20:00, 2:28:32 to 2:28:45.

[52] Id. at 2:28:50 to 2:29:13.

[53] Id. at 2:28:52 to 2:29:25.

Even so, E. Hillebrandt admitted that Soisson received monthly "paychecks" from Check Masters, just as he had from Checks 2 Cash.[54]

Regarding M. Hillebrandt's conduct, E. Hillelbrandt readily admitted that some company checks written by her or by others at her request paid their personal expenses.[55]  When asked if he authorized those checks as the owner of the buiness, E. Hillebrandt stated, "Of course."[56]  E. Hillebrandt testified that other than the incident mentioned by Soisson, M. Hillebrandt did nothing wrong in handling any of the business funds, at least as far as he knew.[57]

At the end of the Adversary Trial, the Court took under advisement Soisson's dischargeability claim under § 523(a)(4).

### 3.    Post-trial Motion

Almost immediately after the Adversary Trial, on May 12, 2011, M. Hillebrandt filed the Motion to Amend Answer, in which she seeks permission to include the affirmative defense of accord and satisfaction in her Answer.  Less than a week later, on May 17, 2011, M. Hillebrandt filed an Amended Answer to Complaint although the Court did not grant her permission to do so.  M. Hillebrandt's only explanation for seeking the amendment at this late date is that her counsel did not become aware of the defense until May 10, 2011, the date of the Adversary Trial.  Apparently, this

---

[54] The evidence at the Adversary Trial regarding Soisson's role in Checks 2 Cash and Check Masters and the monies Soisson received from these companies, leaves many unanswered questions. It is not necessary, however, for this Court to determine the precise nature of Soisson's relationship with the Hillebrandts or the payday loan businesses to resolve his dischargeability claims.

[55] Id. at 2:22:40 to 2:23:06.

[56] Id.

[57] Id. at 2:23:28 to 2:23:34.

is also the reason why her counsel did not include the defense in the Pre-trial Order. As pointed out by Soisson in his Response to Motion to Amend Answer, M. Hillebrandt does not allege that she herself was unaware of the facts underlying her defense. The Motion to Amend Answer does not cite any rule or other authority supporting the late amendment.

Because the Motion to Amend was not filed until after the Adversary Trial, the Court must look to Rule 15(b) of the Federal Rules of Civil Procedure, as made applicable by Rule 7015 of the Federal Rules of Bankruptcy Procedure, to determine whether such an amendment is appropriate under the circumstances. The principal purpose of Rule 15(b) is to make sure that pleading rules do not interfere with the proper presentation of evidence at trial. Specifically, Rule 15(b) applies to amendments either (1) where an objection has been made at trial that evidence is outside the issues raised in the pleadings or (2) where an issue that is outside the pleadings has been tried by the express or implied consent of the parties. M. Hillebrandt did not request an amendment of her Answer at the Adversary Trial, and Soisson did not expressly consent to a trial of the affirmative defense of accord and satisfaction. Therefore, the Court must determine if the record supports a finding that the defense of accord and satisfaction was litigated at trial and that Soisson impliedly consented to the litigation of that issue. See Gogolin & Stelter v. Karn's Auto Imports, Inc., 886 F.2d 100 (5th Cir. 1989); Jimenez v. The Tuna Vessel "Granada", 652 F.2d 415, 420 (5th Cir. 1981) ("[E]ach party is entitled to know what is being tried, or at least to the means to find out. Notice remains a first-reader element of procedural due process, and trial by ambush is no more favored here than elsewhere.").

In the absence of express consent, "trial of unpled issues by implied consent is not lightly to be inferred under Rule 15(b), [and] such inferences are to be viewed on a case-by-case basis and in light of the notice demands of procedural due process." Triad Elec. & Controls, Inc. v. Power Sys.

Eng'g, Inc., 117 F.3d 180, 193-94 (5th Cir. 1997) (citation omitted).  The due process concerns are most acute when a party seeks an amendment to a pleading after the close of evidence.  See Nelson v. Adams USA, Inc., 529 U.S. 460 (2000) (due process, as codified in Rule 15 of the Federal Rules of Civil Procedure, requires that a party have the opportunity to respond before judgment is rendered against him).  The Fifth Circuit has held that whether an issue has been tried with the implied consent of the parties depends upon (1) whether the parties recognized that the unpleaded issue entered the case at trial, (2) whether the evidence that supports the unpleaded issue was introduced at trial without objection, and (3) whether a finding of trial by consent prejudiced the opposing party's opportunity to respond. United States v. Shanbaum, 10 F.3d 305, 312 (5th Cir. 1994).

Because the Court rejected the defense of accord and satisfaction as a basis for granting M. Hillebrandt a judgment on the pleadings under Rule 52(c) of the Federal Rules of Civil Procedure on the ground that the defense was waived, it cannot be realistically said that the issue entered the case, much less that Soisson knowingly acquiesced to its introduction into evidence or that he was given a fair opportunity to present evidence challenging the defense.  See Union Planters Nat'l Leasing, Inc. v. Woods, 687 F.2d 117, 121 (5th Cir. 1982) (denying request to amend answer and noting that "concerns of finality in litigation become more compelling [when] the litigant has had the benefit of a day in court."); T.J. Stevenson & Co. v. 81,193 Bags of Flour, 629 F.2d 338, 370 (5th Cir. 1980) ("[I]t is not often that amendments are allowed after the close of evidence, since the opposing party may be deprived of a 'fair opportunity to defend and . . . [to] offer any additional evidence . . . .'").  The prejudice that Soisson would suffer if the Court permitted the amendment is reflected in the alternative relief Soisson seeks in his Response to Motion to Amend Answer, which is to reopen discovery for ninety days to allow him an opportunity to investigate the factual basis for the defense.

The prejudice Soisson would suffer requires the Court to deny the amendment. See 6A Charles Alan Wright *et al.*, Federal Practice and Procedure § 1493, at 45 (2010).

## Discussion

The Court must consider as a preliminary matter whether the Texas Judgment has any preclusive effect in establishing the elements required under § 523(a)(4) before deciding whether the debt, as reflected by the Texas Judgment entered in the Texas Lawsuit, falls within that discharge exception.

**A.     Collateral Estoppel and the Texas Judgment**

The ultimate determination of the dischargeability of a debt under § 523(a) rests within the exclusive jurisdiction of the bankruptcy court. Gupta v. E. Idaho Tumor Inst., Inc. (In re Gupta), 394 F.3d 347, 349-50 (5th Cir. 2004). The Rooker-Feldman[58] doctrine and the closely-related, if not co-extensive, doctrine of issue preclusion, also known as collateral estoppel, prevents a bankruptcy court from reconsidering the same facts and issues "actually and necessarily litigated" by a state court. See id.; Gauthier v. Cont'l Diving Servs. Inc., 831 F.2d 559, 561 (5th Cir. 1987) (noting that the Rooker-Feldman doctrine is "very close if not identical to the more familiar principle that a federal court must give full faith and credit to a state court judgment"). Thus, even though non-dischargeability is "independent of the issue of the validity of the underlying claim," these doctrines can provide an alternative basis to satisfy the elements of a non-dischargeability claim. See Grogan v. Garner, 498 U.S. 279, 298 (1991); Keaty, 397 F.3d at 270. The opposite is also true: elements of a non-

---

[58] As explained recently by the United States Supreme Court in Skinner v. Switzer, 131 S. Ct. 1289, 1297 (2011), the Rooker-Feldman doctrine bars the losing party in a state court action from seeking federal court review and rejection of that state court's judgment on grounds of subject matter jurisdiction.

dischargeability claim "that have not been actually and necessarily litigated or that are not discernible from the record, must also be determined by [the bankruptcy court] after hearing all relevant evidence . . . ." <u>Harold V. Simpson & Co. v. Shuler (In re Shuler)</u>, 722 F.2d 1253, 1256 (5th Cir. 1984).

In considering the preclusive effect of a prior state court judgment, federal courts must apply whatever preclusive effect a court of the same state that rendered the judgment would afford that judgment. <u>Shimon v. Sewerage & Water Bd. of New Orleans</u>, 565 F.3d 195, 199 (5th Cir. 2009). Therefore, this Court's inquiry begins with a review of the Texas rules of issue preclusion since the Texas Judgment was rendered by a Texas state court. <u>Gober v. Terra + Corp. (In re Gober)</u>, 100 F.3d 1195, 1201 (5th Cir. 1996).

In Texas, the party seeking to invoke the doctrine of collateral estoppel must establish: (1) that the facts sought to be litigated in the second action were fully and fairly litigated in the first; (2) that those facts were essential to the judgment in the first; and (3) that the parties were adversaries in the first action. <u>Bonniwell v. Beech Aircraft Corp.</u>, 663 S.W.2d 816, 818 (Tex. 1984). M. Hillebrandt contends that the Texas Judgment has no preclusive effect because she did not participate in the Texas Trial. In other words, she contends that Soisson cannot satisfy the first requirement, namely, that the factual findings in the Texas Judgment were "fully and fairly litigated."

As to why M. Hillebrandt was absent from the Texas Trial, the evidence at the Adversary Trial showed that the Hillebrandts moved to Mississippi after they closed the Texas operations of Check Masters sometime in 2006. It was near the time of their move, on July 31, 2006, that Soisson filed the Texas Petition against them. Nevertheless, the Hillebrandts were aware of the Texas Petition. Indeed, E. Hillebrandt retained an attorney in Texas to defend them both in the Texas Lawsuit, and M. Hillebrandt recalled being deposed in Mississippi in connection with the Texas

Lawsuit.  Even so, both M. Hillebrandt and E. Hillebrandt claimed that they did not receive notice of the date of the Texas Trial and did not know why their Texas attorney did not inform them of the trial date.  M. Hillebrandt testified that she did not become aware of the Texas Judgment until after Soisson had enrolled it in Mississippi and had garnished her bank account in Mississippi.

Although M. Hillebrandt correctly maintains that a default judgment is not generally granted preclusive effect, she overlooks an exception recognized by the Fifth Circuit when a final default judgment has been entered after the absent defendant has filed an answer.  Garner v. Lehrer (In re Garner), 56 F.3d 677, 680 (5th Cir. 1995) (holding that a post-answer default judgment was entitled to collateral estoppel because the default judgment was entered after a trial), *abrogated on other grounds by* Kawaauhau v. Geiger, 523 U.S. 57 (1998), *as recognized in* Caton v. Trudeau (In re Caton), 157 F.3d 1026, 1030 & nn.18-19 (5th Cir. 1998).  The reason for this exception is the distinction between a "simple" default judgment and a "post-answer" default judgment.  Whereas a "simple" default judgment may be entered on the pleadings alone, the filing of an answer usually requires a plaintiff to offer evidence as to each element of his claim before a "post-answer" default judgment may be entered.  See Pancake v. Reliance Ins. Co. (In re Pancake), 106 F.3d 1242, 1245 (5th Cir. 1997) (holding that statement in final judgment that court heard evidence and arguments of counsel did not show that issues were fully and fairly litigated).  So long as an evidentiary hearing takes place where the plaintiff has to meet his evidentiary burden, such as what takes place when there is a post-answer default, collateral estoppel applies to a "post-answer" default judgment.

Here, the Hillebrandts filed an answer in the Texas Lawsuit.  As shown by the Transcript, the Texas Court conducted a full evidentiary hearing on October 31, 2007, before entering the Texas Judgment.  Thus, despite the absence of the Hillebrandts at the Texas Trial, the Texas Judgment is

entitled to preclusive effect as to those issues "actually litigated." See Restatement (Second) of Judgments § 27, cmt. d (1982) ("When an issue is properly raised, by the pleadings or otherwise, and is submitted for determination and is determined, the issue is actually litigated.").

A closer issue is the extent to which collateral estoppel applies to the factual findings contained in the Texas Judgment. Keaty, 397 F.3d at 271 ("the scope of collateral estoppel is circumscribed by the particularized findings of the state court"). Collateral estoppel applies only to the extent that "the first court has made specific, subordinate, factual findings on the identical dischargeability issue in question–that is, an issue which encompasses the same *prima facie* elements as the bankruptcy issue–and facts supporting the court's findings are discernible from the court's record." Dennis v. Dennis (In re Dennis), 25 F.3d 274, 278 (5th Cir. 1994). Here, the Court has available for its review not only the Texas Judgment, but also the Transcript and the Trial Exhibits, in determining which issues and facts, that are necessary to establish Soisson's § 523(a)(4) claim, were "fully and fairly litigated" before the Texas Court. The Court will undertake this analysis when it considers the elements of Soisson's § 523(a)(4) claim.

**B.      Burden of Proof under § 523(a)**

To except the aforementioned debt of M. Hillebrandt from discharge under § 523(a), Soisson bears the burden of proving his factual allegations by a preponderance of the evidence. Grogan, 498 U.S. at 287-88. A fact is proven by a preponderance of the evidence if the Court finds it more likely than not that the fact is true. EPA v. Sequa Corp. (In re Bell Petroleum Servs., Inc.), 3 F.3d 889, 909-10 (5th Cir. 1993). Although exceptions to discharge are construed strictly against the creditor, and liberally in favor of the debtor, Laughlin v. Nouveau Body & Tan, LLC (In re Laughlin), 602 F.3d 417, 421 (5th Cir. 2010), the Bankruptcy Code "limits the opportunity for a completely unencumbered

new beginning to the 'honest but unfortunate debtor.'" Grogan, 498 U.S. at 287 (quoting Local Loan Co. v. Hunt, 292 U.S. 234, 244 (1934)).

**C.      § 523(a)(4)**

Section 523(a)(4) excepts from discharge any debt that arose out of (1) "fraud or defalcation while acting in a fiduciary capacity," (2) "embezzlement," or (3) "larceny." 11 U.S.C. § 523(a)(4). The embezzlement and larceny exceptions to discharge apply to a debt without regard to whether the debtor was acting in a fiduciary capacity.  Miller, 156 F.3d at 602.  "[T]his discharge exception 'was intended to reach those debts incurred through abuses of fiduciary positions and through active misconduct whereby a debtor has deprived others of their property by criminal acts; both classes of conduct involve debts arising from the debtor's acquisition or use of property that is not the debtor's.'" Id. at 602 (quoting Boyle v. Abilene Lumber Co. (In re Boyle), 819 F.2d 583, 588 (5th Cir. 1987)).

In his Amended Complaint, Soisson alleges that the debt, as evidenced by the Texas Judgment, was procured by M. Hillebrandt's fraudulent conduct and/or was the result of defalcation while she was acting in a fiduciary capacity or, in the alternative, was procured by M. Hillebrandt's embezzlement or larceny.  The Court now turns to whether M. Hillebrandt was "acting in a fiduciary capacity" within the meaning of the first provision of § 523(a)(4).

**1.      Did M. Hillebrandt Owe a Fiduciary Duty to Soisson?**

The scope of the concept of "fiduciary" under § 523(a)(4) presents a question of federal law, although state law determines whether a trust obligation exists in a particular situation.  Gupta, 394 F.3d at 350.  Under federal law, the definition of a fiduciary is limited to instances involving express or technical trusts.  Chapman v. Forsyth, 43 U.S. (2 How.) 202 (1844); Texas Lottery Comm'n v.

Tran (In re Tran), 151 F.3d 339, 342 (5th Cir. 1998). Also, the duties of a fiduciary must exist "prior to the wrong and without reference to it." Angelle v. Reed (In re Angelle), 610 F.2d 1335, 1340 (5th Cir. 1980). For this reason, constructive trusts, implied trusts, and equitable trusts fall short of meeting the requirements of § 523(a)(4). Id. On the other hand, the Fifth Circuit has recognized that § 523(a)(4) is not limited to formal trust agreements but includes relationships in which "trust-type obligations are imposed pursuant to statute or common law." LSP Inv. P'ship v. Bennett (In re Bennett), 989 F.2d 779, 785 (5th Cir. 1993).

Although Soisson alleged in the Texas Petition that the Hillebrandts breached their fiduciary duty to him, there is not even a whisper of the term "fiduciary" in the Texas Judgment. It appears that the issue was not actually determined by the Texas Court or, even for that matter, submitted to the Texas Court for its determination. See In re Garner, 56 F.3d 677, 680 (5th Cir. 1995). Thus, Soisson cannot establish a fiduciary relationship based on collateral estoppel. Instead, the Court must look beyond the Texas Judgment and engage in an independent review of the evidence presented at the Adversary Trial to determine what, if any, trust obligations M. Hillebrandt owed to Soisson. Then, the Court must determine whether those obligations meet the requirements of federal law under § 523(a)(4). See FNFS, Ltd. v. Harwood (In re Harwood), 637 F.3d 615 (5th Cir. 2011).

Among the facts contained in the Texas Judgment is the conclusion that "the plaintiff was a shareholder in the company." At the Adversary Trial, M. Hillebrandt made much of the fact that there was no stock certificate evidencing Soisson's ownership of Check Masters. The time for M. Hillebrandt to contest Soisson's claim of ownership, however, was during the Texas Trial or, perhaps, upon the enrollment of the Texas Judgment in Mississippi. Either way, the challenge now comes too late. This Court may not revisit that issue because of the preclusive effect of the Texas Judgment.

The Court notes, however, that a stock certificate is not necessarily required to prove ownership in a company. See, e.g., Miss. Code Ann. § 79-4-6.26 ("Unless the articles of incorporation or bylaws provide otherwise, the board of directors of a corporation may authorize the issue of some or all of the shares of any or all of its classes or series without certificates.").

Mississippi law applies to matters pertaining to the relationship between officers and shareholders of Mississippi corporations. See Miss. Code Ann. § 75-8-110 (law of jurisdiction under which issuer of stock is organized applies to disputes regarding transfer of stock); Restatement (Second) of Conflict of Laws § 301 (1971); CTS Corp. v. Dynamics Corp. of Am., 481 U.S. 69, 91 (1987) ("It is . . . an accepted part of the business landscape in this country for States to create corporations, to prescribe their powers, and to define the rights that are acquired by purchasing their shares. A State has an interest in promoting stable relationships among parties involved in the corporations it charters . . . ."). Accordingly, because Check Masters is a Mississippi corporation, this Court must look to Mississippi law to determine whether a fiduciary relationship arose as a result of Soisson's alleged shareholder status.

Mississippi follows the generally recognized rule that officers of a corporation "occupy a fiduciary relation to the corporation and its stockholders." Knox Glass Bottle Co. v. Underwood, 89 So. 2d 799, 814 (1956); see also Fought v. Morris, 543 So. 2d 167 (Miss. 1989). As discussed by the Mississippi Supreme Court:

> A director or officer has a duty to the corporation to perform the director's or officer's functions in good faith, in a manner that he or she reasonably believes to be in the best interests of the corporation, and with the care that an ordinarily prudent person would reasonably be expected to exercise in a like position and under similar circumstances.

Omnibank of Mantee v. United S. Bank, 607 So. 2d 76, 84 (Miss. 1992) (citing Principles of Corporate Governance § 4.01(a)).  It is this duty that prohibits an officer from using his position for personal gain where harm will befall the corporation, its creditors, or stockholders.  Home Telephone Co. v. Darley, 355 F. Supp. 992, 999 (N.D. Miss. 1973).  The fiduciary duty of a corporate officer, however, does not extend to an *individual* shareholder.[59]  See Allyn v. Wortman, 725 So. 2d 94, 103 (Miss. 1998).  Therefore, Soisson cannot rely on his shareholder status to demonstrate the existence of a fiduciary relationship under principles of Mississippi law.

Soisson suggests in the alternative that he and the Hillebrandts were business partners in Texas.  See Tex. Rev. Civ. Stat. art. 6132b-4.04 (recognizing the duties of care and loyalty and the obligation of good faith required of partners).  There is no formal written agreement that establishes a partnership between Soisson and the Hillebrandts.  According to Soisson, however, a partnership was formed in Texas by verbal agreement.

Unlike the issue related to stock ownership, this dispute is governed by the law of Texas, where the parties purportedly negotiated, entered into, and performed the agreement.  See Duhon v. Union Pac. Resources Co., 43 F.3d 1011, 1013 (5th Cir. 1995) (federal courts apply choice of law provision of the forum state); Crouch v. Gen. Elec. Co., 699 F. Supp. 585, 592 (S.D. Miss. 1988) (discussing contract choice-of-law principles under Mississippi law).  The Texas Revised Partnership Act ("TRPA"),[60] Tex. Rev. Civ. Stat. art. 6132b-1.01 *et seq*., provides that "an association of two or

---

[59] There is a judicially recognized exception to this general rule where a shareholder can show that he sustained injuries that are separate and unique from the injury to the corporation itself.  Vickers v. First Miss. Nat'l Bank, 458 So. 2d 1055, 1063-64 (Miss. 1984).  Soisson, however, presented no evidence that would justify such an exception.

[60] Although the TRPA expired on January 1, 2010, it was in effect during the events that took place that form the basis of this action.  See Ingram v. Deere, 288 S.W.3d 886, 894 n.4 (Tex. 2009)

more persons to carry on a business for profit as owners creates a partnership." Tex. Rev. Civ. Stat. art. 6132b-2.02(a). TRPA articulates five factors, similar to those under common, that indicate the creation of a partnership:

> (1)     receipt or right to receive a share of profits of the business;
> (2)     expression of an intent to be partners in the business;
> (3)     participation or right to participate in control of the business;
> (4)     sharing or agreeing to share:
>          (A)     losses of the business; or
>          (B)     liability for claims by third parties against the business; and
> (5)     contributing or agreeing to contribute money or property to the business.

Id. art. 6132b-2.03(a). The TRPA contemplates a practical approach to recognizing the formation of a partnership. The TRPA, for example, does not require proof of all five listed factors in order for a partnership to exist. The sharing of profits, an essential element for establishing a partnership under the common law, is not required under the TRPA. Likewise, the TRPA states that the sharing of losses is "not necessary to create a partnership." Id. art. 6132b-2.03(c). Comments to the TRPA recognize, however, that sharing profits and having the right to control are probably the two most important factors, as they are under common law. Tex. Rev. Civ. Stat. art. 6132b-2.03. The Court will determine whether a partnership existed between M. Hillebrandt and Soisson by considering all of the evidence bearing on each of the five partnership factors.

### a. Receipt or Right to Receive Profits

The Texas Court found in the Texas Judgment that Soisson "was entitled to distribution of 50% of the profits of the company." Indeed, "receipt or right to receive a share of profits of the business" suggests the existence of a partnership under TRPA. Id. art. 6132b-2.03(b). However, despite the appearance of that term in the Texas Judgment, the evidence does not indicate that Soisson

_____

(TRPA governs partnerships formed on or after January 1, 1994, but before January 1, 2006).

actually received any "profits" within the legal definition of that term.  A "profit" is defined as "[t]he excess of revenues over expenditures in a business transaction."  Black's Law Dictionary 1329 (9th ed. 2009).  There is no evidence that Soisson received a share of profits after payment of expenses from the gross receipts of the business.  The cash disbursements he received each month apparently came from the gross receipts of the business, without regard to its expenditures.  In Texas, the receipt of gross revenue is not profit sharing.  Schlumberger Tech. Corp. v. Swanson, 959 S.W.2d 171, 176 (Tex. 1997).  Nevertheless, the Texas Judgment makes this finding, which is entitled to preclusive effect and which supports the existence of a partnership.

### b.      Expression of an Intent

"[E]xpression of an intent to be partners in the business" is the next factor in determining whether a partnership exists.  Tex. Rev. Civ. Stat. art. 6132b-2.03(a)(2).  This factor requires evidence that both parties expressed their intent to be partners.  Tex. Rev. Civ. Stat. art. 6132b-2.03(a) ("[f]actors indicating that persons have created a partnership include their . . expression of a intent to be partners in the business").  In that regard, courts in Texas look to the terminology used by the putative partners, the context in which the statements were made, and the identity of the speaker and listener.  Reagan v. Lyberger, 156 S.W.3d 925, 927-28 (Tex. App.-Dallas 2005).  There is no evidence that E. Hillebrandt or M. Hillebrandt ever expressed an intention to be business partners with Soisson.

### c.      Control of the Business

The only evidence of Soisson's right to control Check Masters was his authority to write checks.  As a check-cashing business, however, writing checks was an essential part of the services provided by Check Masters and does not carry the significance that it might otherwise have.  For that

reason, virtually every individual associated with Check Masters had check-writing authority, including not only Soisson, but also M. Hillebrandt, E. Hillebrandt, McCall, Simmons, and others. The right to control a business is more than writing checks but is the right to make executive decisions.  Brown v. Cole, 291 S.W.2d 704, 710 (Tex. 1956).  Soisson submitted no evidence that he made any executive decisions or had the right to make any executive decisions.

**d.      Sharing Losses or Liability**

There is no evidence of the existence of any agreement between Soisson and the Hillebrandts that any losses would be shared among them.  Under the TRPA, however, the absence of an agreement to share losses does not alone negate the existence of a partnership.

**e.      Contribution of Money**

There is undisputed evidence that Soisson contributed $20,000.00 to the business. Tex. Rev. Civ. Stat. art. 6132b-2.03(a)(5). This finding supports the existence of a partnership.

In summary, evidence supporting the existence of a partnership are that Soisson had the right to receive profits and that he contributed money to the business.  On the other hand, there was an absence of evidence of any agreement requiring Soisson to share in any losses, of any expressed intention to be partners, or of any right to control or manage the business.  Consequently, there was neither an express nor implied partnership between Soisson and the Hillebrandts.  In the absence of a partnership or joint venture, no fiduciary relationship existed between them under state partnership

law[61] and it is unnecessary for the Court to engage in any further analysis to determine if a fiduciary relationship existed for purposes of § 523(a)(4).

In conclusion, because the Court finds no fiduciary relationship arising out of Soisson's status as a shareholder of Check Masters under Mississippi law and also finds no partnership, whether express or implied, between Soisson and the Hillebrandts that might give rise to a fiduciary relationship under Texas law, it is irrelevant whether there was fraud or defalcation by M. Hillebrandt. These findings are fatal to the first provision of § 523(a)(4) because the standard of a fiduciary cannot be met where it does not first exist under state law. See Miller, 156 F.3d at 602. The Court next considers the second and third provisions of § 523(a)(4), that is, whether the actions of M. Hillebrandt constitute "embezzlement" or "larceny." As noted previously, neither embezzlement nor larceny is limited to instances involving a debtor's fiduciary status. Boyle, 819 F.2d at 587 n.9.

### 2.    Did M. Hillebrandt Commit Embezzlement or Larceny?

Federal common law governs the meaning of embezzlement and larceny. Smith v. Hayden (In re Hayden), 248 B.R. 519, 525 (Bankr. N.D. Tex. 2000). Both torts involve the fraudulent appropriation of another's property and differ only in the timing of that appropriation. Larceny is defined as the "felonious taking of another's personal property with intent to convert it or deprive the owner of same." 4 Collier on Bankruptcy ¶ 523.10[2] (16th ed. 2010). Embezzlement is defined as

---

[61] Even assuming a general partnership existed, the Fifth Circuit has questioned whether partners owe fiduciary duties to their co-partners under Texas law within the meaning of § 523(a)(4). Hardwood, 637 F.3d at 615. Texas law limits the scope of the fiduciary duty to an accounting and maintenance of those profits derived by him without the consent of the other partners. Tex. Rev. Civ. Stat. Ann. art. 6132b-4.04(f). Under the prior version of this provision, the bankruptcy court in Donohoe v. Hurbace (In re Hurbace), 61 B.R. 563 (Bankr. W.D. Tex. 1986), held that the statute created a trust *ex maleficio*, which did not satisfy § 523(a)(4). See Bennett, 989 F.2d at 786 (noting that Hurbace involved co-equal partners).

"the fraudulent appropriation of property by a person to whom such property has been intrusted, or into whose hands it has lawfully come." Miller, 156 F.3d at 602 (quoting Moore v. United States, 160 U.S. 268, 269 (1895)). Soisson relies on the embezzlement prong of § 523(a)(4). Larceny clearly does not apply here because M. Hillebrandt, as the secretary of Check Masters, came into lawful possession of the funds she obtained. Thus, the Court is left to examine embezzlement, the alternative provision of § 523(a)(4), as defined by federal common law.

Although the Texas Court found in the Texas Judgment that the "Defendants knowingly and intentionally converted and/or embezzled money from the company," its ruling is not conclusive proof of § 523(a)(4) embezzlement. In order for a debt to be deemed non-dischargeable under § 523(a)(4) because of embezzlement, the evidence must show "that the creditor entrusted the debtor with his property, that the debtor misappropriated the property, and that the debtor intended to defraud the creditor." E.E. Norwood & Flat Top Dairy Go Round, LP v. Hicks (In re Hicks), 384 B.R. 443, 451 (Bankr. N.D. Tex. 2008). The key to a finding of embezzlement under § 523(a)(4) is fraudulent intent, a finding that is missing from the Texas Judgment. Fraudulent intent is "an intention to deceive another person and to induce such other person, in reliance upon the deception to assume, create, transfer, alter or terminate a right or obligation with reference to property." First Nat'l Bank of Midlothian v. Harrell (In re Harrell), 94 B.R. 86, 91 (Bankr. W.D. Tex. 1988). "Fraudulent intent may be inferred from the conduct of the Debtor and from circumstances of the situation." Id.

Soisson did not present any direct evidence that M. Hillebrandt misappropriated funds with the requisite fraudulent intent. This Court must determine whether Soisson has proven fraudulent intent by circumstantial evidence. M. Hillebrandt testified without hesitation that she intentionally wrote checks on the business account to pay personal expenses and did so with the knowledge and

consent of Check Masters. The Court found her statement credible. Moreover, her testimony in this regard was consistent with E. Hillebrandt's. Apparently, M. Hillebrandt operated Check Masters as a family-owned business and for that reason believed she was entitled to the revenues of the business as long as E. Hillebrandt consented. Her viewpont of the operations of the business conduct must be considered separately from E. Hillebrandt's. It was E. Hillebrandt, not M. Hillebrandt, who had most of the contacts with Soisson.

Significantly, Check Masters was formed years prior to the start of Soisson's relationship with the Hillebrandts. Indeed, M. Hillebrandt did not find out about Soisson's investment of $20,000.00 until well after the fact and then believed that he had invested in Checks 2 Cash, not in Check Masters. After all, it is undisputed that Soisson's investment was returned to him when Checks 2 Cash ceased doing business.

Moreover, M. Hillebrandt made no attempt to hide her activities: M. Hillebrandt not only wrote some checks to herself, but also some checks to her own creditors, who had no reason to bill Check Masters for their goods or services. She also asked Simmons to write checks for her use. Yet, M. Hillebrandt knew that Simmons's job required her to reconcile Check Masters's bank account. It has been said that "since fraud thrives in the shadows, a debtor who acts openly, without any attempt at concealment, and whose actions can be clearly seen, can negate any fraudulent intent." See Harrell, 94 B.R. at 91. M. Hillebrandt's conduct fits neatly within the description of "a debtor who acts openly." Even Soisson acknowledged the openness with which M. Hillerbandt used corporate funds when he reluctantly agreed on cross-examination that M. Hillebrandt was the "worst embezzler" he had ever known.[62] See Great Am. Ins. Co. v. Storms (In re Storms), 28 B.R. 761, 765

---

[62] Test. of Soisson at 11:22:40-11:23:57.

(Bankr. E.D.N.C. 1983) ("Fraudulent intent may be negated by the fact that the debtor used such funds openly, without attempt to conceal, and had reasonable grounds to believe he had the right to so use."). The circumstantial evidence does not support a finding that M. Hillebrandt's use of corporate funds was intended to harm Soisson.

### Conclusion

In conclusion, the Court finds that the Texas Judgment is not excepted from discharge pursuant to either § 523(a)(4) or § 523(a)(6). The Court further finds that the Motion to Strike should be denied; that the Motions to Exclude should be denied; that the Debtor's Motion to Exclude all Testimony of Chris McCall should be denied as moot; that the Motion to Amend Answer should be denied; and that the Amended Answer to Complaint should be stricken from this Adversary.

A separate final judgment on the Amended Complaint will be entered in accordance with Federal Rule of Bankruptcy Procedure 9021. A separate order will be entered on the aforementioned motions.

SO ORDERED.